Good morning, Your Honors. Ronald Timm on behalf of Appellant Henry Aguila. I believe that the issues have been well briefed, but I did just want to highlight a couple points. I think that the central issue here is, does an interpleader action insulate an insurance company from liability for its bad acts? And our position is that it doesn't. In this case, the facts are that Penn Star was an insurer for the appellant, that it was involved in defending a case that the appellant had brought for bad faith on the part of the insurance company. And my client made a 998 offer to the insurance company, and part of the terms of that 998 offer was that the amount of the settlement, which was about $1.9 million, was to be paid directly to my client, and that my client would take care of any... So that was illegal under California law? It wasn't illegal as long as the consent of the... The court was obtained, but at that point it hadn't been, right? I'm sorry? The court could approve that, but the court had not done so at that point. That's correct, but certainly my client could make that offer, and then it would be subject to the approval of the lien holder that they approved that terms of that settlement. And my client... Your client knew or should have known that there were lien holders, right? Yes, the lien holders had filed liens in the case. My client... And so he should have known that this agreement would not be legal unless it received court approval, yes? Well, I'm disagreeing with that characterization. There's two alternatives. One is that it's legal if you get the approval of the lien holder, or if the lien holder doesn't approve, then you have to get court approval in spite of that. And my client believed when Penn Star accepted the 998 offer, and Penn Star was aware of the law as well, that Penn Star had obtained that consent from the lien holder. And in fact, as it turns out afterwards, Penn Star had contacted the lien holder, and the lien holder had told Penn Star, no, I don't approve of that. And Penn Star did not pass that on to my client. My client would not have proceeded with that 998 offer, and the judgment had it known that the lien holder expressly told Penn Star that it did not approve of those terms of the offer. Instead, Penn Star went ahead and accepted the offer, knowing that it could not and would not comply with the terms of that settlement provision. And Penn Star owed a special duty to my client. It was the insurer for my client. There was a duty there not to act in bad faith. But instead, Penn Star, thinking that it's just going to accept the settlement, knowing that it can't comply. And then, once it's accepted, it's just going to throw the funds into the interpleater and throw up its hands and say, well, I washed my hands of everything. What damages have you suffered, assuming all that you just said occurred? As you said, what damages have you suffered? Well, certainly part of the damages are that my client believed that he was buying peace by doing this settlement, and that he would be able to work out in a non-litigation fashion with the lien holder how to divvy up the funds. But instead, he was assured of having to continue with litigation. He wasn't getting the peace that he had bargained for because Penn Star intended to put it in an interpleater, forcing my client to be in a litigation mode to try and settle this thing. So he had emotional distress, and he also wasn't able to receive the full benefit of that settlement. They ended up, you know, providing funds to the lien holder afterwards to settle the matter, but my client didn't get the benefit of the bargain. He thought that he was going to get peace, and he didn't get peace. Instead, Penn Star, which by accepting the settlement offer, basically, you know, admitted that it had acted in bad faith once with my client, and then in the process acted in bad faith a second time with my client. And we don't believe that Ninth Circuit law, especially the case that's cited in our brief, Lee v. West Coast Life Insurance Company, provides insulation to an insurance company by an interpleater action from its bad faith actions. When the bad faith of the insurance company causes the whole controversy, the whole problem. That case is, I think, different than what you have here because here, Penn Star, I don't see how they created the conflict over these funds. There are lien holders. They existed. I can't quite see how your client thought that he was going to get peace because he was going to have to deal with these lien holders one way or another. Now it's an interpleater action. Otherwise, he would have been dealing with them independently. So can you just explain to me how it is that Penn Star created the conflict here in the same way that I think was the case in West Coast Life? Well, certainly, you know, the facts are different from West Coast Life, but principles developed in a case can apply to other cases that don't have the exact same facts, and we think that that's the principle is that an interpleater action does not protect, in this case especially, an insurance company who is acting with unclean hands. And the insurance company was acting with unclean hands. It may have been a different unclean hands than were the facts of that case, but here the unclean hands were that Penn Star owed a special duty to my client, and it withheld key information. It withheld information that it had contacted the lien holder, and the lien holder had expressly told Penn Star that it was not consenting to the settlement. But from those acts, by the faith or not, there was no economic injury to your client, right? There was economic injury in that basically my client didn't get the full benefit of the settlement. It's speculative. What's the full benefit? The $1.9 million. Minus the liens. I'm sorry? Minus the liens. Well, just, you know. No, he was obligated. I mean, he doesn't contest, he's obligated. In fact, he undertook to pay the liens, right, under the agreement? Under which agreement here? The insurance company. Yes, he said that he would. So that's not his damage. His damage is, you know, that $1.9 million minus the liens, right? Well, just because somebody has filed a lien doesn't mean that they're going to receive or have the right to receive that full amount. He was going to be negotiating with those entities to settle the matter, and instead he had to pay legal fees to litigate in the interpleader action. So he did suffer economic damage in that he had to pay legal fees to. . . He would have legal fees, you know, if he contested the liens outside of interpleader. Well, it's a matter of whether you do it in an informal process or litigate. You know, if it doesn't settle informally, it's going to become formal, right? I'm sorry, Your Honor. If it doesn't settle in the informal process, it's going to become a formal lawsuit. It could. So, you know, I don't understand what the economic benefit, any economic benefit that was lost by putting it in interpleader. Well, I think it's a question of 100% certainty of litigation versus the opportunity to try to settle it without incurring those costs. So he was denied the ability to work out an arrangement informally with the lien holders. Instead, he was 100% assured of litigation, and he says that had he known that the lien holder expressly said, I'm not agreeing to this, he would not have entered into this arrangement, and he would have continued with the litigation. He believes that he would have received much more than $1.9 million from Penn Star. So that's part of his economic loss as well, that he was of the opinion based on his experts that the case was worth much more than $1.9 million he was willing to settle, to take less, thinking he was getting some peace out of the situation. So, I mean, so then he's getting litigation one way or the other. Either he's litigating with Penn Star or he's litigating interpleader, but it doesn't seem that there's a situation where there's no litigation. Well, the situation where there's no litigation is that if he'd been able to just work out informally with the lien holder, the arrangement to pay the lien holder, if he'd gone the litigation route with Penn Star, he then had the upside of receiving much, much more than $1.9 million. So he was willing to give up that extra amount to try to have at least the opportunity for peace in his life. Penn Star was sitting there with information, knowing this isn't going to end for you. You're going to be in litigation. All he had to do, if he had examined the law, he would have known that his proposal, even though they accepted it, in fact, could not be accepted unless the lien holders agreed or the court so ordered it in some fashion. So all he had to do was call up the lien holders and say, did you agree or not? He didn't do that, did he? No, Your Honor. He believes that Penn Star is much bigger. It's an institution. It certainly knows the law as well. He was represented by counsel, right? He was represented by counsel, yes. Counsel would be able to place a phone call in approximately 30 seconds or less to find out the answer, right? Could have made that phone call, but they relied on their belief that Penn Star They've not a statement. They never, Penn Star never said, we've got the agreement of the lien holders. No, but Penn Star knew, just as Your Honor is saying, that it would be unlawful to enter into that agreement without that lien holder consent. He knew it too, or it seemed to have known it because it was the law. And so why didn't his counsel have the same responsibility to find out whether they were agreeing or not? That still doesn't excuse Penn Star because it owed special duties to my client to at least disclose to my client what Penn Star knew. Penn Star knew that CLG had opposed it. If Penn Star hadn't contacted CLG and hadn't been told that CLG opposed it, I would agree with Your Honor. But here where Penn Star was hiding information from my client, I believe that that was bad faith. Do you want to reserve some time for rebuttal? I have very little, but yes. Thank you. We'll give you two minutes when you come back up. Thank you. First, thank you. I'm honored to be here. Let me speak about, ironically here, it feels that it was Aguilera's conduct that was designed to avoid having to pay those liens by serving this 998 when the CLG liens were already in the record. And now he's trying to fob his duty to obtain the lien holder consent, which is what the statute says. He's trying to fob it on to Penn Star, which Penn Star, mind you, was, quote, on the clock, as we might say, trying to respond to a 998 under the penalties of accept or reject to your own risk. The Lee v. West Coast case is the one that sets forth the basic rule that a stakeholder is not subject to liability for its failure to resolve a controversy over the entitlement to the stake itself, and one cannot sue the stakeholder for damages flowing from the filing of an interpleader action, which is what we have here. Aguilera misapplies the exception stated therein. Case law also indicates that a claimant can file actions against the stakeholder that don't involve payment of the stake itself, right? There are exceptions. It only covers cases in which the plaintiff wants to get more from the stake. It doesn't cover tort actions, does it? You're correct. There are situations where there's independent claims that can be made against the stakeholder, which are not barred by the discharge once they interplead, but that's not the facts here. But this is a tort action, isn't it? Sure. All right. So again, I don't know what the prayer is, but it's the only basis of liability. I want more of the stake. It's not a context over the stake, is it, this action? He's suing. The proposed tort action. The proposed tort action is a fight over Penn Star's decision in accepting the 998 and then choosing to interplead it instead of picking Aguilera as the one who should get the money. Excuse me, Aguilera as the one who should get the money. That's what he's really suing over. That's what the district court found when it looked at the state court action and analyzed what is that suit really about, what is the gravamen of that suit, and that's what they found. I'm asking, what is the gravamen of the suit? Or would he understand the gravamen of it? The gravamen of the suit is... It's not a lawsuit, but would he understand the gravamen of the lawsuit to be? Well, I think it's twofold. They're tied together. But one fold is they say that Penn Star somehow knew that the lien holder did not consent. We're stuck with those pled facts. I don't agree with them, but we're stuck with them. So they're saying Penn Star knew that before it accepted 998, and it should have run over to Mr. Aguilera, who's represented by counsel, and told him, hey, by the way, you know, you didn't get their consent, and they don't consent. But more importantly, Aguilera's upset that Penn Star did not pick him as the guy it should pay the money to, and instead raised its hands and said, I'm not here to decide which stakeholder gets the money. I'm going to go ahead and interplead it because there's a dispute amongst multiple stakeholders. I know all that. I mean, it all falls from the interplead action, but my question, what is your understanding of the substance of his proposed suit? You know, what is Aguilera trying to get out of that proposed suit or his counterclaim? I don't know what he's trying to get out of it. He's trying to say that the insurance company, who is now embroiled in a litigation with him, had a duty of somehow to turn around and advise him, hey, your 998 might be, your purpose or thought behind the 998 might be thwarted because if we go ahead and accept it, these lien holder claims might actually swallow up most of what you're seeking. And he thinks we have the duty to, number one, ascertain if the lien holders consent or don't consent. And why would they consent? I don't know if they're getting any money here. But number two, that we have this duty to then turn around and advise opposing parties. A duty, this is a dangerous public policy that they're trying to set, I suppose, but that a party has a duty to advise the other side about their poor litigation tactics and you made a bad 998 because now you have to pay these lien holders. Gee, did you obtain their consent first? What's next? And I know they're trying to hook it on. Well, they're my insurance company. They owe me a duty of good faith and fair dealing. And they cite this Gruenberg case for that proposition. Well, no kidding, an insurance company owes a duty of good faith and fair dealing while a claim is ongoing. In Gruenberg, it was a first-party fire laws, a harsing claim. And so they said the insurance company, while handling the claim, owes you a duty of good faith and fair dealing. That's not this situation. Now he's sued them for breach of contract and they are adversaries embroiled in a litigation. So the notion that the duty of good faith and fair dealing would still apply in that litigation is horrible public policy because now every insurance company in litigation was insured. When it files a motion for summary judgment, you would have to say, by the way, Mr. Insured, you want to know the weakness in our motion? Because I owe you a duty of good faith and fair dealing. Oh, you served a 998. Did you recognize that those liens were filed a month ago and they're going to dwarf what you're seeking? Did you work something out yet with the lien holders? Because if not, maybe you want to withdraw the 998, even though I have a client over here that would like to accept it. So that's what I think the gist of his suit is, quite frankly. He's misapplying the exception in Lee. In Lee, the facts were that the insurance company was the one who improperly changed an endorsement pre-litigation and it ended up causing a fight between the beneficiaries. The insurance company then tried to, after creating the problem by something in its underwriting process, then tried to interplead the money and say, you guys can work it out over there. And they said, no, you can sue the insurance company directly for its pre-litigation conduct where it mishandled the endorsement. The case that's more on point is Prudential v. Hovis. That's more factually on all fours and analogous to our situation. That's where the insurance agent, Mr. Hovis, sold this policy to a woman and the beneficiary on the policy was her son. Then he goes and tries to submit an endorsement himself to change the beneficiary from her son to him, the agent. And the insurance company had an internal policy that says, we can't be having our life insurance agents changing beneficiaries and putting themselves, the selling agent, as the beneficiary. So the insurance company said, time out. We have to investigate this. They're investigating. They didn't create the problem. Mr. Hovis did when he tried to submit this beneficiary change. So in that case, the court ended up discharging both the bad faith and negligence claims, saying that the insurance company did not create the problem. Mr. Hovis did. And so he essentially was suing Prudential for not picking him over the other claimant. That's more analogous to this situation. We didn't start the fire, so to speak. When this 998 was made, those liens were already in existence. Heck, if he withdrew the 998, I guess that's what he's saying, and prosecuted the case to a judgment, case won. Same problem. What's he going to do about those liens? And bigger problem for Pemstar. What does it do? Pay Mr. Goulet? Under the statute, it says you go in and dishonor our liens and pay the judgment predator. Guess what? Now the lien holder can sue you for the same amount. So the same exact situation would have happened if this matter went to a judgment. Pemstar would have been in a pickle once again. Who do I pay? Well, we didn't start the fire. We didn't create the problem. We don't have to pick between stakeholders and decide which one gets it. So we would have interpled once again. I also want to talk about, they cited this case, Wetland, with regard to the litigation privilege. And they were saying that the litigation privilege that we've asserted and subject of our motion for judicial notice does not apply to bar breach of contract claims. Well, that can be true depending on the factual situation. First of all, they sued for three tort claims and one breach of contract. So really, what is the thrust of that suit? But look at the two cases that are within Wetland that discuss this. It's the Pollack case, and it's the Laborde, L-A-B-O-R-D-E. In Pollack, they actually did end up saying, no, litigation privilege bars both tort and breach of contract. Well, what was the facts of it? There, an attorney sues another attorney who made a promise to tell the court the case settled and to take an MSC off calendar, but the other lawyer didn't tell the court it settled. So an LSC for sanctions was set against the first lawyer who decided not to show up at that MSC. He sued the other lawyer in the litigation for fraud and breach of contract theories, tort contract. The court held that both are barred under litigation privilege. Number one, the plaintiff had other remedies. Number two, they said public policy is not supportive by letting this guy proceed under a contract theory. So litigation privilege should apply. Here, there were other remedies that existed for Mr. Arguella if what he says is true. Number one, if he thinks the way he worded the judgment wasn't clear enough, and it should have also had the terms of, gee, you've got to pay the money to me, despite these known lien holders out there, then he had a Rule 59E motion to just alter the terms of the judgment or get it clarified with the court. He also, if he really thought he was agreed to, oh, my God, Penn Star, how dare you not disclose this to me. I'm now very frustrated with you because you're not paying me the money. He had a Rule 60B motion to relieve him of a judgment that was due to either his mistake, which is really what he's claiming, or misconduct of opposing party. So he had other remedies, just like in Pollack. So therefore, and obviously the public policy here does not support allowing you to sue an opposing litigant for a breach of contract theory because it didn't advise you of what you should be doing in the litigation on a 998 response. The Laborde case, 92-4459, there they sued a psychologist for breach of contract in court theories. After he had hired the psychologist to conduct a custodian evaluation in a dissolution case. There the court looked at it and said, okay, you sued him for contract. Litigation privilege doesn't usually bar contract, but let's look at the gravamen of what you're suing for. And if the gravamen is a tort, we are going to use litigation privilege to bar the tort and a breach of contract. There they said the gravamen was a tortious interference case against the psychologist. Okay, let's apply that here. What is the gravamen of what they're suing? First of all, look at the underlying complaint, 304, torts. And the gravamen is, I guess he's saying, hence they're committed either fraud or bad faith, both are torts, because it didn't advise him in an oldest duty of good faith and fair dealing. That's not a breach of contract. The gravamen of that suit is tort. So, while it's true in Wentland, W-E-N-T-L-A-N-D, the case rejected applying the litigation privilege in that case. They logically, reasonably said because it's not based on wrongful conduct during the litigation, like it was in Pollard and Laborde. But it was based on an independent promise made by the other litigant pre-litigation. So, they thought applying it in that situation to bar the breach of contract would thwart the public policy of enforcing pre-litigation contracts. None of that applies here. So, while it is true sometimes the litigation privilege will not reach out and knock down a breach of contract claim, under those two cases, it would. And that's our situation. And I also just, I'm all set, but I just wanted to, there's a motion for judicial notice of the underlying demur that was sustained by the trial court because he did, that case proceeded after it was remanded back to the trial court. I didn't know what to do with that, quite frankly, because it occurred after the appeal was filed and after, obviously, everything was done by our trial judge. But I think it's worth noting that that court did find litigation privilege applied, both that and the federal version, which is Knorr-Pennington Doctrine. It found that both applied to bar the underlying suit in its entirety. I'm not saying this court's bound by that. We just cited principles such as comity. Do we really want to have inconsistent rulings between courts? And also, just to show the court, we've argued on litigation privilege here. It's an issue of law. And we just wanted to alert the court. The state court has already ruled on it. I don't know if you want to take judicial notice of its rulings or you don't, but I just want to remind the court that that motion, I don't believe, has yet been ruled on. But thank you for my time today. And thank you for your time. Okay, you have two minutes. Thank you. Thank you. I will be short for no other reason than I only have two minutes left. The case, again, boils down to the fact that, yes, maybe Penn Star did not have a duty to go to the lien holder to find out if the lien holder approved of the settlement. But that's not what we're dealing with here. Here we're dealing with a situation where Penn Star did go to the lien holder and was told by the lien holder in no uncertain terms, I don't approve of this settlement. And Penn Star kept that information from my client. I still assert that Penn Star owed my client a duty of good faith, and by withholding that information was not acting in good faith. And then Penn Star went a step further and accepted the offer knowing that it could not legally comply with the terms of that offer. That also is acting in bad faith. And so, again, we believe that where an insurance company has unclean hands, which it does here, it cannot then say that it's entirely insulated from liability because of an interpleader action. With regard to the litigation privilege, we cited a California case that says that the litigation privilege does not insulate and is not going to be used to insulate an insurance company from liability for bad faith. The ruling by the state court on the litigation privilege has no impact on this case. It's not raised judicata. That case is still pending. It was staged for the court to find out what happens with this case. And so that ruling basically has no impact on this case, and it's really not up to this court to decide whether the litigation privilege applies or not. Thank you. Thank you. Thank both counsel for their arguments this morning, and this case is now submitted.
judges: TASHIMA, THOMAS, Rakoff